UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 23-21478-CIV-SCOLA/GOODMAN

RENELL JONES,

      Petitioner,

v.

RICKY D. NIXON,
Sec'y, Fla. Dep't of Corr., et al ,

      Respondent.

_____/

**REPORT AND RECOMMENDATIONS**
**RECOMMENDING DENIAL OF § 2254 PETITION**

Movant Renell Jones ("Petitioner" or "Jones") filed a motion/petition (the "Motion" or "Petition") to vacate his conviction and sentence for First-Degree Felony Murder, Armed Burglary with Assault or Battery, Armed Robbery with a Deadly Weapon, and Conspiracy to Commit Armed Robbery. [ECF No. 1]. Jones argues that his constitutional rights were violated because his statements were improperly admitted at trial. The Government filed a response in opposition to Jones's habeas petition [ECF No. 9] and Jones filed a reply [ECF No. 13]. Senior United States District Judge Robert N. Scola Jr. referred the § 2254 motion to the Undersigned. [ECF No. 3].

For the reasons discussed below, the Undersigned **respectfully recommends** that

Judge Scola **deny** Jones's habeas motion.

## I.      Factual and Procedural Background[1]

This case involves the murder of Miguel Lopez Garcia ("the Victim"), who was stabbed to death in his home on July 2, 2012. [ECF No. 1, p. 3]. Police learned that multiple individuals, including Alexander Pena, were set to visit the Victim's home that day. *Id*. Police reviewed Pena's cell phone records and found text messages between him and the Victim regarding a drug deal. Police also found text messages between Pena and Jones regarding a drug deal. The day before the murder, Jones had informed Pena that he was flying to Miami from Maryland and asked about where he could purchase a taser. Jones rented a car upon his arrival in South Florida.

About two years later, two Miami detectives flew to Maryland to speak with Jones. At the time, Maryland police officers had taken Jones into custody on a warrant in an unrelated Maryland criminal case. Jones provided an inculpatory statement/confession during the interview[2] and his statements were used as the basis for his arrest and prosecution in the Victim's murder. Jones argues that the evidence from the interview should have been suppressed for reasons outlined later in this Report.

-------

[1]      The factual and procedural history is based upon the Petition and its attached appendices. [*See* ECF No. 1].

[2]      Petitioner provided a video copy of the interview to the Undersigned's Chambers. In preparing this Report and Recommendations, the Undersigned personally reviewed the interview in its entirety.

Petitioner filed a motion to suppress his statements, and after a multi-day suppression hearing, the state court trial judge denied his request for relief.[3] On December 4, 2018, a jury found Jones guilty on all counts. Miami-Dade Circuit Judge Lisa Walsh[4] sentenced him to life on the First-Degree Felony Murder and Armed Burglary with Assault or Battery counts, thirty years on the Armed Robbery with a Deadly Weapon count, and five years on the Conspiracy to Commit Armed Robbery count.

Following the imposition of his sentence, Petitioner filed a direct appeal to the Third District Court of Appeal, arguing the same grounds he raises in the Petition. After hearing oral argument, the Third District affirmed his sentence *per curiam* with citations to various state court opinions but did not include any formal, separate written analysis behind its decision. *Jones v. State*, 338 So. 3d 1030 (Fla. 3d DCA 2022). The appellate court issued its mandate on April 18, 2022 after denying Petitioner's subsequent request for rehearing or a written opinion.

The appellate court's decision barred Petitioner from seeking any further state court appeals because the opinion was "a *per curiam* affirmance with citations to cases not pending before the Florida Supreme Court." *Jollie v. State*, 405 So. 2d 418, 420 (Fla. 1981)

---

[3]     Petitioner contends that the written order denying his motion to suppress did not address all of his claims.

[4]     Miami-Dade Circuit Judge Miguel De La O presided over Petitioner's original Motion to Suppress hearing and issued a written order [ECF No. 10, pp. 175-95] denying his motion [ECF No. 10, pp. 33-59]. Judge Lisa Walsh presided over Petitioner's trial.

(citing *Lake v. Lake*, 103 So. 2d 639, 642–43 (Fla. 1958) (discussing that the Florida Supreme Court has no authority to determine the validity behind a *per curiam* affirmance when neither another district court of appeal nor the Florida Supreme Court have decisions that conflict with the affirmance)).

## II.    Legal Standard and Analysis

Petitioner raises five grounds for relief:

I.    Habeas Relief is Warranted Since There Was No Valid Administration of Petitioner's *Miranda*[5] Rights. Instead, He Was Told to Read the Rights Form "Just So That I Know That You Know How to Read" and Was Told to Initial After Each Right If He Understood the Right, Not If He Agreed to Waive It.

II.    Florida State Courts Erred in Finding that Petitioner's Statements Regarding Wanting a Lawyer, Wanting to Protect Himself, and Not Wanting to Say Anything to Harm Himself Were Equivocal, and Alternatively Even if They Were [sic] Equivocal It Was Coercive and Overbearing in Violation of *Miranda* For the Detective to Respond by Convincing Petitioner To Waive His Rights and Confess.

III.    A Fair Understanding of the Detective's Statements to Petitioner in Context Demonstrates That the Detective Was Telling Petitioner He Was in Custody on the Miami-Dade Homicide Case, Which was False and Which Elicited the Statements.

IV.    The State Courts Erred in Denying the Claim That the Statements Were Inadmissible Because They Were Procured Via the Detective Giving Petitioner False Legal Advice, That His Silence Would be Admissible and Held Against Him at Trial.

V.    The State Courts Erred in Denying the Claim That the Statements Were Suppressible Because They Were Made When Petitioner Was Illegally Detained, Because the Only Basis for Petitioner's Detention Was an

---

[5]    *Miranda v. Arizona,* 384 U.S. 436, 460–61, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

> Unrelated Maryland Warrant Which Required Him to Be Brought Before the Maryland Commissioner Forthwith, But Instead He Was Held in Custody Without That Warrant Being Executed for Nine Hours, So That Miami-Dade Detectives Could Question Him.

[ECF No. 1].

The Undersigned will address each argument in order. Additionally, both parties agree that an evidentiary hearing is not necessary "because the factual basis of the claims were fully developed in the state court proceedings[.]" [ECF No. 9, p. 14]. Respondent also concedes that Petitioner's Motion was timely filed. *Id.* at 10.

Petitioner filed his Motion under 28 U.S.C. § 2254. Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides the following standard for federal courts granting habeas relief following a state court judgment:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Burton v. Comm'r, Ala. Dept. of Corr.*, 700 F.3d 1266, 1269 (11th Cir. 2012).

For a state court's decision to be considered "contrary to" clearly established Supreme Court precedent, it must either (1) apply a rule that contradicts the governing law as set forth by the Supreme Court, or (2) arrive at a differing result from a Supreme Court decision that had materially indistinguishable facts. *Burton*, 700 F.3d at 1269 (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). And for a decision to involve an "unreasonable application" of federal law, a state court must have correctly identified the governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the particular case. *Id.* "The term 'unreasonable' in § 2254(d) is reserved for '**extreme malfunctions** in the state criminal justice system,' not for 'ordinary error' or even for cases 'where the petitioner offers a strong case for relief.'" *Samuel v. Carlin*, No. 2:20-CV-00545-REP, 2023 WL 3627647, at *3 (D. Idaho May 24, 2023) (emphasis added) (quoting *Mays v. Hines,* 141 S. Ct. 1145, 1149 (2021) *(per curiam)*).

Courts will not find the existence of an unreasonable application of federal law where "fair-minded jurists could disagree" on the correctness of the state court's decision. *Harrington*, 562 U.S. at 88.

Under this highly deferential standard of review, the statutory phrase *clearly established federal law* "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions." *Mitchell v. Esparza*,

540 U.S. 12, 16 (2003).

"[A] state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* (internal quotations omitted). Moreover, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Given these strict rules, the Undersigned is mindful of the principle that if the standard set by § 2254 "is difficult to meet, that is because it was **meant to be**." *Harrington*, 562 U.S. at 102 (emphasis added). While the AEDPA "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," it preserves the authority of issuing the writ of habeas corpus only in those **exceedingly rare** cases where there is **no possibility** that fair-minded jurists could disagree that the state court's decision conflicts with Supreme Court precedent. *Id.*

To meet this high standard, a petitioner must prove that the state court's ruling "was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fair-minded disagreement." *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (quoting *Harrington*, 562 U.S. at 103).

The United States Supreme Court has stated that courts should "not lightly conclude that a State's criminal justice system has experienced the extreme malfunctio[n] for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (internal quotations omitted); *accord Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1343 (11th Cir. 2013) (affirming order denying § 2254 petition and noting that the "AEDPA reflects the view that habeas corpus is a guard against *extreme malfunctions in the state criminal justice systems*, not a substitute for ordinary error correction through appeal"). The Supreme Court has also emphasized that "[e]ven a strong case for relief does not make the state court's contrary conclusion unreasonable." *Harrington*, 562 U.S. at 88.

Under the AEDPA, there is, therefore, "a critical difference between the question of whether to reverse for a claimed constitutional error on direct appeal and the question of whether to grant habeas relief after the state courts have rejected the claim of constitutional error." *Ferguson*, 716 F.3d at 1331. And the distinction itself "is critical to the proper functioning of the federal writ of habeas corpus in the post-AEDPA age." *Id.* Accordingly, "[t]he Supreme Court has not hesitated to reverse grants of habeas relief ordered by courts of appeals that ignore the distinction between direct appeal type *de novo* review and the more restrictive, highly deferential review mandated by 28 U.S.C. § 2254(d)(1)." *Id.*; *see also Moody v. Comm'r, Alabama Dep't of Corr.*, 682 F. App'x 802, 806 (11th

Cir. 2017) *cert. denied* 138 S. Ct. 684 (2018) (noting that although arguments "might give us some pause if we were exercising plenary review of a Sixth Amendment claim on direct appeal from a federal conviction," the Court cannot conduct an "unfettered analysis" but must review a habeas petition "under AEDPA deference, and that makes a difference.").

Moreover, when analyzing a § 2254 petition, federal habeas courts must understand that the AEDPA "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010). Thus, under § 2254(d)(1), a state court's decision to reject a constitutional claim, even if done without an explanation of the reasons, is entitled to deference. *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002); *see also Erwin v. Sec'y, Fla. Dep't of Corr.*, 568 F. App'x 749, 752 (11th Cir. 2014) ("Since the state court affirmed [the petitioner's] convictions after he argued that the trial court's decision regarding cross-examination violated his rights under the Confrontation Clause, that decision is an adjudication on the merits that is entitled to deference under § 2254(d)(1)."); *Childers v. Floyd*, 736 F.3d 1331, 1334 (11th Cir. 2013) (granting deference to state appellate court decision affirming conviction even though it did not expressly address Confrontation Clause claim).

Petitioner's § 2254 claim here challenges the district court's evidentiary rulings concerning his allegedly inadmissible statements and the appellate court's review of the evidentiary ruling. When the state appellate court affirmed the denial of postconviction

relief, it did so without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Here, the last state-court decision that provides a "relevant rationale" is Judge De La O's Order denying Petitioner's Motion to Suppress. [ECF No. 10, pp. 175-95].

Federal courts do not sit to review evidentiary rulings of state courts unless the alleged error is of such magnitude as to have rendered the trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (noting that federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction might have been deficient, and highlighting that "[t]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"); *DeBenedictis v. Wainwright*, 674 F.2d 841, 843 (11th Cir. 1982) (rejecting challenge to allegedly improper introduction of hearsay evidence to establish the essential elements of the state's case). Whether the fundamental fairness of the trial was compromised is an issue addressed "through an examination of the entire record." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970).

Additionally, state evidentiary rulings -- i.e., a trial error type of claim -- are subject to a harmless error analysis. If the error had a "substantial and injurious effect or influence in determining the jury's verdict[,]" then the gravity of that error would justify habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see Holland v. Fla.*, 775 F.3d 1294, 1298 (11th Cir. 2014) (concluding that errors raised by Florida state prisoner's habeas petition "were harmless because they did not have a 'substantial and injurious effect or influence' on the jury's verdict." (quoting *Brecht*, *supra*)). Accordingly, federal habeas corpus relief is rarely deemed appropriate for claims predicated on allegations of state evidentiary error. *Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984) ("This Court and its predecessor have demonstrated a proper reluctance to second-guess state court evidentiary rulings on habeas review, rarely granting relief on the basis of such rulings.").

**A. Whether There Was a Valid Administration of Petitioner's *Miranda* Rights.**

Petitioner argues that he did not validly waive his *Miranda* rights because the detectives presented the form to him as "a literacy test or reading comprehension exercise, not an opportunity to either invoke the protections of the rights or make a knowing, voluntary, and intelligent waiver of the rights." [ECF No. 1, p. 19]. According to Petitioner, the detective told him, "basically we just bring you a form. Just so that I know that you know how to read." *Id*. Petitioner contends that the detectives "literally told [him] that the sole purpose of reading the form aloud to the detectives is to demonstrate that he can

read[;]" and that was a *Miranda* violation because "it minimized the importance" of his rights. *Id.*

Petitioner also argues that when the detective told him to initial the *Miranda* form after each right "if [he] understood", that the detective's statement, with the "if you can read" context, was actually telling Petitioner to initial after each right "if he comprehended the text he was asked to read aloud", "not if he was willing to waive" his *Miranda* rights. *Id.* at 19–20.

Therefore, Petitioner argues that when he initialed next to the line, "Knowing these rights, are you now willing to answer my questions without having a lawyer present?" he was stating "that he was able to comply with the detectives' directions and read and understand each line." *Id.* at 20.

In determining whether a waiver was voluntary, knowing, and intelligent, the Court looks at the totality of the circumstances to determine whether there was a free, uncoerced choice and full comprehension of the rights and consequences of waiving them. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Some courts have found that the execution of such a form was sufficient alone to constitute a valid waiver. *State v. Roman*, 983 So. 2d 731, 735 (Fla. 3d DCA 2008) (citing *United States v. Johnson*, 426 F.2d 1112, 1115 (7th Cir. 1970) ("Having signed the written waiver form, without evidence to the contrary, [the defendant] cannot now contend that he did not understand his rights.")).

Here, the trial court judge found that Petitioner failed to cite any authority "for the

notion that having a suspect read the warnings for himself violates *Miranda*" and quoted

the following from *Roman*, 983 So. 2d at 737[6]:

> We have found no case where a statement was suppressed where a valid written waiver form had been executed by the defendant. The contrary is the rule. *See United States v. Sledge,* 546 F.2d 1120 (4th Cir. 1977); *United States v. Coleman,* 524 F.2d 593, 594 (10th Cir. 1975) (stating that "information of rights by written form has been upheld in many Circuits[ ]"); *N. Carolina v. Strobel,* 164 N.C. App. 310, 596 S.E.2d 249, 253 (2004) ("[I]t is not essential that the warnings required by *Miranda* be given in oral rather than written form. Thus, the mere fact that Sergeant King did not read the *Miranda* warnings to defendant, standing alone, does not render defendant's waiver ineffective.").

*Id.* at 737.

Judge De La O proceeded to explain the lack of evidence supporting Petitioner's

claim that his *Miranda* waiver was involuntary:

> Jones is a college graduate and initialed that he understood each of his rights on a *Miranda* waiver form. *See Thomas v. State*, 894 So. 2d 126, 136 (Fla. 2004) ("He also signed a written waiver asserting his understanding. Although a written statement is neither necessary nor by itself sufficient to establish waiver, it is strong proof that a waiver is valid. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979).") *See also United States v. Johnson*, 426 F.2d 1112, 1115 (7th Cir. 1970) ("Having signed the written waiver form, without evidence to the contrary, [the defendant] cannot now contend that he did

---

[6]   In *Roman*, the appellate court analyzed whether the defendant was clearly informed of his *Miranda* rights and whether those rights were validly waived. *Id*. There, the defendant argued that "[m]erely reading the *Miranda* rights form. . . ., by itself, does not establish that he understood and comprehended the rights he was giving up and the real consequences of his waiver.", *State v. Roman*, No. F02-12509E, 2005 WL 6389816 (Fla. 11th Cir. Ct. Nov. 29, 2005). The defendant also highlighted the fact that he was "illiterate", "very poorly educated", "very low mentality", and was sixteen years old at the time of the interview. *Id*. Additionally, the appellate court found that, "[i]t appears from the transcript that Roman was more comfortable speaking Spanish than English." *Roman*, 983 So. 2d at 736.

not understand his rights.").

Additionally, there was no testimony introduced at the Hearing to call into question Jones's understanding of his rights, his ability to understand what he read, or --most fundamentally -- the voluntariness with which he answered the Miami detectives' questions. It is obvious from the manner in which Jones expresses himself throughout the interview that he is educated, of above-average intelligence, and has no difficulty comprehending the terms used in the *Miranda* waiver form.

[ECF No. 10, pp. 185–86]. However, as Petitioner points out, Judge De La O did not

address his argument that the detectives minimized the "importance of the rights." [ECF

No. 1, p. 19].

Petitioner cites *Ross v. State*, 45 So. 3d 403, 429 (Fla. 2010) [7] to support his view that

there was never a valid *Miranda* waiver because, under *Ross*, the Florida Supreme Court

suppressed evidence for reasons including how the officers downplayed and minimized

the significance of the *Miranda* rights -- which Petitioner argues happened here. However,

not only is *Ross* irrelevant for our analysis (because it is not a *federal* case), but the police

---

[7]      In *Ross*, the suspect's waiver was found to be involuntary when police interrogated him "over a period of several hours of custodial interrogation, deliberately delayed administration of warnings required by *Miranda* . . ., obtained inculpatory admissions," and did not provide warnings until "midstream" during the interrogation. *Id*. at 407.

Here, the detectives administered the *Miranda* waiver about twenty minutes after Petitioner was brought to the recorded interview room. The interrogation video shows the detectives and Petitioner engaging in *relatively* friendly and respectful banter. Petitioner informed detectives that, before the interview, he had slept six hours, did not have any mental illnesses or problems, could read and write in English, that he was previously arrested and that he has been read *Miranda* before. He also explained that he is a college graduate. Furthermore, the Miami detectives were using a low-key, relaxed manner and provided him with bottled water.

conduct in *Ross* is far more egregious than the conduct here. It was ***more*** than just that "the police downplayed the significance of the *Miranda* warnings."

Petitioner argues that "[b]ecause there was no valid waiver, the entire statement should have been suppressed. The State trial and appellate court's determination that there was a valid *Miranda* waiver were contrary to and an unreasonable application of clearly established federal law, and is also an unreasonable application of the undisputed facts[.]" [ECF No. 1, p. 22]. Petitioner's statement functions as a *de facto* catch-all argument which simultaneously tries to incorporate both of the § 2254 requirements in his argument.

However, as Respondent states, Petitioner failed to establish that the state court findings "resulted in a decision that was contrary to or was an unreasonable application of clearly established federal law, or that the state court decision was based on an unreasonable determination of the facts considering the evidence presented." [ECF No. 9, p. 22]. The Undersigned agrees. Petitioner does not argue that the state court applied a rule that **contradicts** governing federal law or that it arrived at a different conclusion from a Supreme Court decision with **materially indistinguishable facts**. See *Burton*, 700 F.3d at 1269 (citing *Bell*, 535 U.S. at 694).

Petitioner's argument seems more geared towards the "unreasonable application" approach because it is based on the state court's application of *Miranda* to his facts. He does not include any **federal** authority (aside from cases that simply quote *Miranda*) to

15

support his argument that the detectives' conduct minimized the *Miranda* warnings and rendered his waiver involuntary. Additionally, at no point does he explain **why** the state court's application of *Miranda* was unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold."). The only time he mentions the term "unreasonable" is in the final sentence within that section.

Petitioner failed to demonstrate that the decisions of the state and appellate courts were contrary to or involved an unreasonable application of clearly established federal law. They were reasonable determinations based on the evidence presented. The Court must treat the factual determinations made by the state courts with the presumption of correctness unless they are clearly erroneous. *Harris v. Dugger*, 874 F.2d at 762. Accordingly, the presumption remains, which means that this claim should be **denied**.

**B. Whether the Courts Erred in Finding That Petitioner's Statements Regarding Wanting a Lawyer Were in Violation of *Miranda*.**

        1. *Whether Petitioner's Statements Regarding Wanting a Lawyer and Remaining Silent Were Equivocal*

Petitioner argues that he clearly and repeatedly attempted to invoke his *Miranda* rights. [ECF No. 1, p. 23]. He repeatedly states that his statements, "in context," show that he "wished to invoke his Fifth and Sixth Amendment *Miranda* rights . . . and the officer, unlawfully, ignored this invocation and continued interrogating Petitioner and using

pressure tactics to secure a statement from him." *Id.* at 25.[8]

If a suspect effectively waives his right to counsel after receiving *Miranda* warnings, then law enforcement officers are free to question him. *North Carolina v. Butler*, 441 U.S. 369, 372–376, 99 S. Ct. 1755, 1756–1759, 60 L. Ed. 2d 286 (1979). But, if that suspect requests counsel at *any time* during the interview, then he is not subject to further questioning until a lawyer has been made available or until the suspect himself reinitiates conversation. *Edwards*, 451 U.S. at 484–485, *supra*. However, if the suspect's invocation is **not clear** to the police, then the officers are not obligated to immediately cease their questioning. *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313 (1975) ("a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity").

Whether a subject equivocally invoked his right to counsel is an objective inquiry. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994). In *Davis*, the Supreme Court held,

> If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

---

[8]    Petitioner makes an argument concerning Alexander Pena's (his co-defendant in the state criminal case) statement that this Court will not consider because it was "never part of the state court record[.]" *Id*. The Court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011).

> To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect **might** want a lawyer. Unless the suspect **actually** requests an attorney, questioning may continue.

*Id* at 461–62 (emphasis added).

Here, Petitioner told detectives, " . . .I'm not going home anyway. I, I think I, I need to get a attorney then. If you telling me somebody, I think I need to get an attorney. I don't know I, I, I don't know. I don't wanna say nothing to, to, to fuck myself." [ECF No. 10, p. 94]. He cites to *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) as an example of a case where a federal court "found that the same statement is an unequivocal invocation of *Miranda*." *Id.* at 28.

But Respondent argues that Petitioner's reliance on *Cannady* is misplaced because the Eleventh Circuit there granted the writ based on the defendant's "statement to the police during questioning as to his whereabouts on the night of the murder that 'I think I should call my lawyer,' and found it was an unequivocal request for counsel under the totality of the circumstances." [ECF No. 9, p. 30]. The *Cannady* Court found that the detective knew the defendant wanted to speak to an attorney because he pushed a phone to him and waited for the defendant to make a call. Additionally, when the defendant did not call an attorney using the phone, the detective asked a question that the *Cannady*

Court determined was "not a clarifying question but was directly about the murder and not to clarify whether [the defendant] wanted to speak to an attorney." *Cannady*, 931 F.2d at 755.

In contrast, after Petitioner made his "I think I need to get an attorney" statement, the detectives informed him that if he needed an attorney "just like we told you in the *Miranda* we can stop at any time, you can talk to an attorney." [ECF No. 10, p. 95]. They informed Petitioner that he would remain in custody regardless because of the evidence they had already gathered. They told Petitioner that they "would hate to make a mistake" based on what Petitioner's co-defendant told them regarding Petitioner's actions. *Id*. "You, see, you understand what I'm saying. I'm giving you a full chance to do whatever you want. You want to talk to an attorney, that's fine, **but you said if**. If you still want to keep talking to me, this is your opportunity to talk to me." *Id*. (emphasis added).

Petitioner argues that the detectives "did understand" Petitioner's invocation as unequivocal "because [the detective] immediately switched gears to trying to convince Petitioner not to invoke his *Miranda* rights and to keep talking, using various tactics to achieve that goal." [ECF No. 1, p. 28]. The Undersigned disagrees.

Detectives not only reminded Petitioner of his *Miranda* rights, but also directly confronted Petitioner with his ambiguous "I *think* I need to get an attorney" statement. (emphasis added). They clarified whether he was invoking his rights (even though they had no obligation to do so). *Davis*, 512 U.S. at 461–62 ("But we decline to adopt a rule

requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). The instant case, while sharing similar language to the statement in *Cannady*, is not the same situation because not only was Petitioner's statement ambiguous but he even doubled-down on his intention to speak with detectives later in the interview, when he made it clear that he did ***not*** want to stop the interview and get an attorney because he had nothing to hide. [ECF No. 10, p. 156].

> He explicitly said,
>
> And I, I like I said, as far as me having a nothing shaking me looking you in your eye, let's take a lie detector test; I didn't stab nobody. I didn't stab nobody, **I didn't even wanna say I wanna stop and I want my attorney to talk, because I don't have nothing to hide**.

*Id.* (emphasis added).

Petitioner fails to make any mention of this portion of his testimony in his Motion. Additionally, unlike the situation in *Cannady*, Petitioner read and signed the *Miranda* form **before** the questioning started. In *Cannady*, detectives first questioned the defendant and then at some point the defendant said "I think I should call my lawyer." The *Cannady* Court held that the detectives violated the defendant's rights when they continued to ask him questions about his alleged involvement in a crime.

At no point does Petitioner's Motion discuss how the decisions of the state and appellate courts were contrary to or involved an unreasonable application of clearly

established federal law.[9] He argues that the state courts "relied upon an unreasonable determination of the undisputed facts on the interrogation video." [ECF No. 1, p. 33]. But he never addressed how the points made in the Order denying his Motion to Suppress were unreasonable.

Therefore, this claim should be **denied.**

2. *Whether Detectives Used Overbearing and Coercive Law Enforcement Methods*

Petitioner argues that, even if his invocation was equivocal, then it was a product of the coercive and overbearing tactics the detectives supposedly used to convince him to waive his rights. [ECF No. 1, p. 22]. He states that the detectives repeatedly gave him false advice and affirmatively misled him. *Id.* at 30. Petitioner cites to *Hart v. Atty. Gen.*, 323 F.3d 884 (11th Cir. 2003) to argue that **neither** state court here analyzed whether his *Miranda* waiver was "knowing, intelligent, and voluntary given the police deception regarding its consequences, which means the state courts 'failed to identify the correct legal rule and their decisions were thus contrary to clearly established law, as determined by the Supreme Court.'" *Id.* at 32.

However, both state court opinions indicate the contrary. In its *per curiam* holding,

---

[9]   Petitioner addresses this argument in his reply brief for the first time. However, the Undersigned will not consider it because, in the Eleventh Circuit, courts do not consider arguments raised for the first time in a reply brief. *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court." (citation omitted)).

the Third District Court of Appeals held,

> Affirmed. *See Ramirez v. State*, 739 So. 2d 568, 575 (Fla. 1999) ("Whether the [*Miranda*] rights were validly waived must be ascertained from two separate inquiries: **'First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived'''**) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)); *State v. Owen*, 696 So. 2d 715, 719 (Fla. 1997) (adopting the legal principle announced in *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), and holding that "police in Florida need not ask clarifying questions if a defendant who has received proper *Miranda* warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her *Miranda* rights"); *Walker v. State*, 957 So. 2d 560, 571 (Fla. 2007)("I think I may need a lawyer," held to be an equivocal request for counsel); *Owen v. State*, 862 So. 2d 687, 696–98 (Fla. 2003)("I don't want to talk about it" and "I'd rather not talk about it" held to be equivocal invocations of right to silence*); Joseph v. State*, 259 So. 3d 123 (Fla. 4th DCA 2018)( "I don't think it will be something for me to be, you know, maybe discussing certain things until maybe I get a lawyer" was not an unequivocal request for counsel); *State v. Carter*, 172 So. 3d 538, 540 (Fla. 5th DCA 2015) ("Maybe I should talk to a lawyer" was not an unequivocal request for counsel). *See also State v. Mallory*, 670 So. 2d 103, 106 (Fla. 1st DCA 1996) ("An officer's indication that the defendant would benefit from cooperation is not sufficient to constitute coercion of the waiver" of *Miranda* rights) (citing *State v. Manning*, 506 So. 2d 1094, 1097 (Fla. 3d DCA 1987)).

*Jones*, 338 So. 3d at 1031 (emphasis added).

In his Order denying Petitioner's Motion to Suppress, Judge De La O explicitly

discussed and analyzed whether Jones's waiver was knowing, intelligent, and voluntary:

> Additionally, there was no testimony introduced at the hearing to call into

question Jones's understanding of his rights, his ability to understand what he read, or -- **most fundamentally -- the voluntariness with which he answered the Miami detectives' questions. It is obvious from the manner in which Jones expresses himself throughout the interview that he is educated, of above-average intelligence, and has no difficulty comprehending the terms used in the *Miranda* waiver form.** Jones also claims the officer **lied to him** by inferring they had the power to arrest him for the Miami murder. . . The Miami detectives answered Jones truthfully, revealing as little as necessary **without lying to Jones**. . . The critical fact is that the Miami detectives answered the question literally, without unnecessary detail, and **truthfully**. The Constitution does not require more.

***

Jones asserts that even if *Miranda* was properly administered to him, the Miami detectives subsequently undermined the *Miranda* warnings because they told him that this was his only opportunity to speak to them. The Court finds that the Miami detectives did not say or imply Jones would never be able to speak to them in the future.

***

In determining whether Jones unequivocally and unambiguously invoked his right to remain silent, certain principles are important. First, the proper focus is on Jones's whole statement, not just on individual words, phrases, or sentences unmoored from their context.

***

Finally, the Court notes that the Miami detectives were **scrupulous** about advising Jones that he could speak to a lawyer if he wished, **that it was his decision and they could not give him advice in that regards.**

[ECF No. 10, pp. 184–192 (emphasis added)].

*Hart* is not analogous to the instant case. In *Hart*, the defendant, a teenager, waived his *Miranda* rights and confessed because a female detective's deception and contrary statements led him to "not truly understand the nature of his right against self-

incrimination or the consequences that would result from waiving it." 323 F.3d at 895. All of the detectives involved knew Hart from previous interactions. After Hart signed his *Miranda* waiver, he said that he knew nothing about the alleged crime. When confronted with evidence, he asked to speak with a specific female detective, one he **trusted** as a **friend**. This separate detective told him that " she had never lied to him in the past, and she would not lie to him now." *Id.* at 888. She informed him that he was in "the biggest trouble [he] could ever be in [,]" and that if he was tried as an adult then it was very likely that he could be given the death penalty. *Id*. When asked what the pros and cons of having an attorney were, the female detective told him that "[an attorney will] protect your rights. He'll tell you what to answer, what not to answer, and he'll be here for you." *Id.* at 889. She followed that by saying, "I'm going to want to ask you questions and he's going to tell you you can't answer me." *Id*.

Petitioner states that, "[t]he *Hart* Court found that the waiver was not knowing, intelligent, and voluntary when after the defendant waived *Miranda* via a written form he asked an officer what the pros and cons of getting a lawyer were and the officer said the con was 'a lawyer would tell Hart not to answer incriminating questions[;]'" and that the officer told Hart that "honesty wouldn't hurt him[.]" [ECF No. 1, p. 31].

Petitioner conveniently fails to describ*e Hart* as involving a detective who egregiously took advantage of a young defendant's trust in her. He positions his argument by making it seem as though the *Hart* Court ruled the way it did because the

detective simply lied to the defendant -- which is incorrect. The issue is not that the detective simply *lied* to Hart; the issue was **how** she lied to him and **how** she took advantage of his trust in her. In stating that "honesty will not hurt you," she **directly contradicted** the *Miranda* warning that his statements could be used against him. Hart was a teenager; Petitioner was not (and was, in fact, a college graduate). Hart knew and trusted the detective; Petitioner did not know the Miami-based detectives and had no reason to rely on them or trust them.

Petitioner lists the detectives' lies as follows: (1) the fact that he would not be arrested for the murder if he did not confess; (2) talking would be smart and help him clear his name and face lesser charges; (3) silence would be used against him in court. [ECF No. 1, pp. 31–32]. Because these points relate to Petitioner's other arguments, the Undersigned will address them below.

**C. Whether a Fair Understanding of the Detective's Statements to Petitioner in Context Demonstrates That the Detective Was Telling Petitioner He Was in Custody on the Miami-Dade Homicide Case, Which was False and Which Elicited the Statements.**

Petitioner argues that (combined with the other factors) the alleged lie regarding his custody status in the Miami case led to him making an involuntary statement. [ECF No. 1, p. 34]. The state trial court rejected that argument, reasoning that the detectives "were not obligated to advise Jones that they did not have a warrant for his arrest on the Miami murders. The critical fact is that the Miami detectives answered the question literally, without unnecessary detail, and truthfully. The Constitution does not require

more." [ECF No. 10, p. 186].

Petitioner contends that asking the detectives whether he was being "brought on charges" implied that he understood those charges to concern the murder these homicide detectives were questioning him about. [ECF No. 1, p. 35]. "The answer to that question at the time it was asked was no, **but the detective lied and said it was yes**." *Id*. A review of the video and the relevant transcripts show that his contention is a misleading statement about what happened.

In responding to Petitioner's "am-I-being-brought-on-charges" inquiry, the detectives did not lie and tell him that he was being brought on *murder* charges. As Respondent points out, when Petitioner followed up with the detectives in asking if he could know his charges, they told him that they would talk with the State Attorney. [ECF No. 9, p. 37]. In Florida, the State Attorney is exclusively responsible for deciding what charges to bring and whether to prosecute. *Id*. The detectives had no power to decide what charges, if any, to bring against Petitioner. Therefore, Respondent points out that none of the detectives' statements regarding Petitioner's charges were false or rose to the level of coercion. *Id*.

Petitioner cites *Ramirez*, 739 So. 2d at 576–77[10] in arguing that the Florida Supreme

_____

[10]     The Undersigned will not consider this argument because not only is *Ramirez* a state case (and the standard here is based on **federal** law), but also because the facts are significantly different. In *Ramirez,* (1) the defendant was a juvenile (unlike the 41-year-old Petitioner); (2) the detectives administered the *Miranda* warnings **after** they had already elicited the young defendant's confession; (3) they made comments implying that

Court overturned a conviction "based in part upon a similar misleading of a defendant as to his custody status." [ECF No. 1, p. 35]. He also cites to *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010), to argue that "although misrepresentations of fact do not render a confession involuntary, 'misrepresentations of law, on the other hand, are much more likely to render a suspect's confession involuntary.'" *Id.*

*Lall* is similar to *Hart* in the sense that both cases involve detectives who stated or implied that anything the defendant said would not be used against him -- in **direct** contradiction to the *Miranda* warnings. Additionally, the detective in *Lall* told the twenty-year-old defendant that "he would not be charged for any statements or evidence collected on the night of the robbery[.]" *Id.* at 1287. As already mentioned in the earlier discussion on *Hart*, the detectives here did not make any misleading statements that directly conflicted with *Miranda*.

Petitioner argues that detectives misled him into thinking he was in custody for a murder charge, when he was not (because he was in custody only for the Maryland stolen vehicle charge) and that this was a misrepresentation of his legal status and therefore a misrepresentation of the law. Petitioner's argument is incorrect. When the detectives were questioning him, he was legitimately in custody for the Maryland charge. The detectives never expressly stated or assured him that he was under custody based on a *murder*

---

the *Miranda* warnings had no significance; and (4) when the juvenile asked whether he was under arrest, the detectives told him "no" even though they had elicited enough evidence from him to establish the necessary probable cause. *Id.*

charge.

Petitioner concedes that "one can argue the officers statements were not literal lies." [ECF No. 13, p. 15]. The trial judge here provided a logical, evidence-based rejection of Petitioner's argument and he has not demonstrated that this factual finding was unreasonable:

> Jones also claim the officers lied to him by inferring they had the power to arrest him for the Miami murder. In response to Jones saying he just wanted to go home, the Miami detectives told him he would not be "going home today." The Miami detectives insist they made this statement because Jones had been arrested pursuant to the Washington County arrest warrant and therefore he was going to be transported to jail.
>
> The Miami detectives answered Jones **truthfully**, revealing as little as necessary **without lying** to Jones. Jones did not ask if he was under arrest for the Miami murder. Perhaps that is what Jones was asking, perhaps not. The Miami detectives were **not obligated** to advise Jones that they did not have a warrant for his arrest on the Miami murders. The critical fact is that the Miami detectives answered the question **literally, without unnecessary detail, and truthfully**. The Constitution does not require more.

[ECF No. 10, p. 186 (emphasis added)].

In his reply, Petitioner states that he cited *Lall* because "the court said, relying on the Supreme Court in *Bram v. United States*, 168 U.S. 532 (1897), that "misrepresentations of law . . . are much more likely [than misrepresentations of fact] to render a suspect's confession involuntary." [ECF No. 13, p. 15 (brackets in original)]. Petitioner's argument is an inaccurate and ill-conceived summary of what was actually said by the Supreme Court. The *Lall* Court neither credited nor cited *Bram* in making that statement. Instead, it included the following cites (neither of which cite to *Bram*), "*See, e.g., Henry v. Kernan,*

28

197 F.3d 1021, 1027–28 (9th Cir. 1999) (police stated to suspect 'what you say can't be used against you right now'); *see also Hopkins v. Cockrell*, 325 F.3d 579, 584–85 (5th Cir. 2003) (officer assured suspect 'that their conversation was confidential ')." *Id*. Additionally, the language the *Lall* Court mentioned from *Bram* referenced the consequences of direct or implied promises of leniency on *Miranda* warnings -- not comments about a suspect's custody status. Petitioner's argument here does not concern "any direct or implied promises, however slight." *Lall*, 607 F.3d at 1285.

This claim should consequently be **denied** because Petitioner failed to provide any federal authority demonstrating that the state court decisions were contrary to or involved an unreasonable application of clearly established federal law. He also failed to demonstrate how the state court's factual determinations were unreasonable.

**D. Whether the State Courts Erred in Denying the Claim That the Statements Were Inadmissible Because They Were Procured Via the Detective Giving Petitioner False Legal Advice, That His Silence Would be Admissible and Held Against Him at Trial.**

Petitioner argues that the detective's statement "that his silence would be used at trial and considered by the jury as evidence of guilt was plainly improper and in the core class of police statements that will render a resulting confession involuntary." [ECF No. 1, p. 38]. However, as Respondent notes, the detective

> did **not** advise Petitioner that his post-arrest silence would be admissible at
> trial. Instead, he presented a scenario in which his co-defendant would
> testify against him. The officer then suggested that a defense attorney
> would advise Petitioner not to testify at trial. However, if he chose to testify
> at trial, then the jury would speculate why he did not provide his story at

the time of his arrest.

[ECF No. 9, p. 45 (emphasis added)].

Respondent correctly states that "a juror's speculation as to why a defendant did not provide a post-arrest statement is not the same as a prosecutor improperly cross-examining him or commenting during closing argument about his post-arrest silence." *Id.* (citing *Welch v. United States*, 371 F.2d 287, 291 (10th Cir. 1966) (The court "ha[d] no doubt that jurors often speculate about trial proceedings . . . , [a]nd for what it is worth, we accept as a reality the natural and human frailties of jurors, such as curiosity, as potential instruments of prejudice.")).

Petitioner argues that Respondent's juror speculation statement still involves "the detective impermissibly trying to convince the defendant to waive *Miranda*," and that "no other interpretation of the detective's statement makes sense. The detective was not musing about what jurors would speculate about in a vacuum. The detective was saying the jurors would ask as their 'first question' why Petitioner had not given a statement 'back then' because any 'good lawyer' would have pointed that out to them." [ECF No. 13, p. 17].

Here, Petitioner's argument is based on his assertion that he was "clearly considering invoking his *Miranda* rights, having said 'I mean to protect anything that I might get myself involved at this point right here, don't you think, don't you think I should talk to somebody I mean." [ECF No. 1, p. 38]. Detectives responded "Listen,

whatever you wanna do **that's your choice**." [ECF No. 10, p. 91 (emphasis added)]. The detectives properly told Jones that they could not tell him what to do.

The Order denying Petitioner's Motion to Suppress discussed this issue. Judge De La O found that the detectives "made the point that if he later decided to speak to them, the credibility of his story at that time would be called into question because the jury might wonder why he did not tell the story initially, and it might appear his story was coached. For all the reasons set forth in this Order, these statements by the Miami detectives did not undermine the voluntariness of Jones's statement." [ECF No. 10, p. 186].

In discussing whether Jones unequivocally and unambiguously involved his right to remain silent, Judge De La O held that

> Applying these principles to the statements at issue leads to the obvious conclusion that Jones did not ambiguously invoke his right to remain silent, and no reasonable officer would have understood his statements as doing so. In the First Statement, Jones ruminates that *maybe* he should talk to "someone" before he speaks, but he does not actually say he wants to talk to "someone" first. In the Second Statement, Jones does not say he wants to remain silent. Rather, he is worried that what he says will hurt him. . . . Neither statement, separately or jointly, constituted the unequivocal, unambiguous invocation of the right to remain silent necessary to justify this Court excluding Jones's statement.

*Id.* at 188–89 (emphasis in original).

The state appellate court briefly addressed this same argument in its *per curiam* opinion: "*See also State v. Mallory*, 670 So. 2d 103, 106 (Fla. 1st DCA 1996) ('An officer's indication that the defendant would benefit from cooperation is not sufficient to

constitute coercion of the waiver' of *Miranda* rights) (citing *State v. Manning*, 506 So. 2d 1094, 1097 (Fla. 3d DCA 1987))." *Jones*, 338 So. 3d at 1031.

Petitioner adamantly states in his reply that "*no* other interpretation of the detective's statement [that a jury would hear that Petitioner was silent in a police interview if he were to testify at trial] makes sense." [ECF No. 13, p. 17 (emphasis added)]. The Undersigned disagrees, especially because **both** state courts were able to interpret the statement differently.

A *Miranda* waiver is effective "only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (citing *Moran*, 475 U.S. at 421 (internal quotation marks omitted). The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).

Even when there is a causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a due process violation. *Connelly*, 479 U.S. at 164 n.2. Regardless of whether coercion or deception was present, the ultimate question is "whether, under all of the surrounding circumstances, the statement was the product of the accused's 'free and rational' choice." *United States v.*

*Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994).

Here, Petitioner has not demonstrated that the trial court unreasonably found that detectives did not use intimidating, coercive, false, or overbearing techniques to obtain a valid, voluntary waiver of Petitioner's constitutional rights. To be sure, a prosecutor may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining him about his post arrest silence after receiving *Miranda* warnings, *Doyle v. Ohio*, 426 U.S. 610 (1976), but that is not what was said by the detective or what occurred in this case.

The transcript and video recording of the interrogation refute Petitioner's argument that the Miami detectives advised Petitioner that his post-arrest silence would be *admissible* and held against him at trial. After Petitioner essentially asked Sergeant Hatzis for his legal advice on whether to invoke his *Miranda* rights, Sergeant Hatzis correctly advised Petitioner that he could not tell him what to do. Petitioner then recognized on his own that "the repercussions are both ways." Unlike the defendant in *Hart*, Petitioner was not seeking clarification of his right to counsel.

Later in the interview, Sergeant Hatzis did not advise Petitioner that his post-arrest silence would be **admissible** at trial. Instead, he presented a scenario in which his co-defendant would testify against him. The officer then suggested that a defense attorney would advise Petitioner not to testify at trial. However, if he chose to testify at trial, then the jury would *speculate* why he did not provide his story at the time of his arrest. [ECF

No. 10, p. 92].

A juror's *speculation* as to why a defendant did not provide a post-arrest statement is not the same as a prosecutor improperly cross-examining him or commenting during closing argument about his post-arrest silence. *See Welch,* 371 F.2d at 291 (The court had "no doubt that jurors often speculate about trial proceedings . . ., [a]nd for what it is worth, we accept as a reality the natural and human frailties of jurors, such as curiosity, as potential instruments of prejudice").

The trial court addressed this argument in its Order:

> Jones asserts that even if *Miranda* was properly administered to him, the Miami detectives subsequently undermined the *Miranda* warnings because they told him that this was his only opportunity to speak to them. The Court finds that the Miami detectives did not say or imply Jones would never be able to speak to them in the future. Rather, they made the point that if he later decided to speak to them, the credibility of his story at that time would be called into question because the jury *might **wonder** why* he did not tell the story initially, and it might appear his story was coached. For all the reasons set forth in this Order, these statements by the Miami detectives did not undermine the voluntariness of Jones's statement.

[ECF No. 10, p. 186 (emphasis supplied)].

In any event, the state court's findings are reasonable and entitled to AEDPA deference. *Richter*, 562 U.S. at 101.

Accordingly, this claim should be **denied** because of Petitioner's failure to meet the necessary standards.

The Undersigned finds that the state court decisions are based on a reasonable determination of the facts considering the evidence presented there. Additionally,

Petitioner failed to include any **federal** case law with "materially indistinguishable facts" or show how the state courts decisions were "so lacking in justification that there was an error well understood and comprehended in existing law **beyond any possibility for fair-minded disagreement**." *Dunn*, 138 S. Ct. at 11.

### E. Whether Petitioner Was Illegally Detained Because the Only Basis for His Detention Was an Unrelated Maryland Warrant.[11]

Petitioner argues that he was illegally detained when the Miami detectives were questioning him because he was in custody based on a Maryland warrant. [ECF No. 1, p. 42]. Petitioner notes that the warrant explicitly stated that he "was to be arrested and brought before a judicial officer 'as soon as practicable and without unnecessary delay.'" *Id.* at 43. Police arrested Petitioner at 4:30 PM and served the warrant at 1:30 AM the following morning.

He argues that under Maryland Rules 4-212(e) and (f), "any deliberate or unnecessary delay in presenting an accused before a District Court Commissioner . . . must be given very heavy weight in determining whether a resulting confession is

---

[11]    Respondent argues that this claim is foreclosed because he never presented the federal nature of this claim in state court, which means the claim is unexhausted and therefore procedurally barred). [ECF No. 9, p. 54 (citing *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998))]. Respondent additionally states that because the claim was raised on direct appeal, it cannot be reconsidered in a motion for postconviction relief. *Id.* (citing *McCrae v. State*, 437 So. 2d 1388, 1390 (Fla. 1983)). Petitioner states that he argued that the illegal detention violated *Anderson v. United States*, 318 U.S. 350 (1943) and his federal constitutional rights. [ECF No. 13, p. 18]. In an abundance of caution, the Undersigned will address the merits of that argument (as if it is properly exhausted).

voluntary because that violation creates its own aura of suspicion." *Id.* (citing *Williams v. State*, 825 A.2d 1078, 1095 (Md. 2003)). Petitioner then quotes *Hiligh v. State*, 825 A.2d 1108, 1116 (Md. 2003) in arguing that the "delay[ed] presentment in order to interrogate an accused for the purpose of extracting incriminating statements constitutes a violation of the Rule and that such a violation is a factor to be considered in determining the voluntariness of any resulting confession." *Id.* Petitioner states that this violation is to be given "very heavy weight" in determining the voluntariness of his confession.

Judge De La O directly addressed this argument in his Order. He found that Petitioner failed to include any supporting authority "in support of his view that if police in Maryland do not take an arrestee without any delay to a Commissioner, then courts must *automatically* suppress any voluntary statement made by the person. Indeed, Jones provided this Court cases which hold the opposite[.]" [ECF No. 10, p. 183 (emphasis in original)]. Even without Petitioner presenting any supporting authority, Judge De La O still evaluated the delay "as one factor in determining the voluntariness[12] of his statement to the Miami detectives[;]" but did not find that it rendered his statement involuntary. *Id.* at 184.

---

[12]     Having watched the entire videotaped interview, the Undersigned deems it significant that Petitioner seemed comparatively relaxed, was not handcuffed during the interview, was provided with multiple bottles of water as well as soup and crackers from Subway, walked around the interview room when detectives left him alone, did not ask questions indicating a lack of understanding, and appeared as comfortable as a suspect can be when being questioned in a police interrogation room for a murder investigation.

Petitioner argues that under *Anderson*, 318 U.S. 350 (1943), the Supreme Court strongly disapproves of holding a citizen unlawfully "by one unit of government to allow another unit of government to interrogate them[.]" [ECF No. 1, p. 44]. However, this issue in *Anderson*, as Respondent points out, was decided based on **state** law, not federal law. [ECF No. 9, p. 61].

Therefore, the Undersigned will follow *Williams*, which holds that the delay in serving Petitioner with his warrant is to be considered as a *factor* in determining the voluntariness of his statement. *See* 825 A.2d at 1095. And, as previously explained, this Court, in agreement with both state courts, finds that Petitioner validly waived his *Miranda* rights, and that this delay issue does not outweigh any of the other factors previously addressed. This claim should consequently be **denied**.

Again, Petitioner failed to include any **federal** case law with "materially indistinguishable facts" or show how the state court's decisions were "so lacking in justification that there was an error well understood and comprehended in existing law **beyond any possibility for fair-minded disagreement**." *Dunn*, 138 S. Ct. at 11. The cases he cites (*Hiligh* and *Williams*) mandate that courts assign special weight to a delay as a factor in determining whether a confession was voluntary but do *not* require that the confession be rendered involuntary after a delay. Additionally, both of those cases are based on state, not federal law. The only federal case he cites to is *Anderson*, and, as previously stated, the relevant holding there was based on state -- **not** federal law.

### III.    Certificate of Appealability

Rule 11(a) of the Rules Governing § 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued, then "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." To merit a certificate, Petitioner must show "that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise." *United States v. Rhodes*, Nos. 8:13-cr-347-T-23TGW, 8:16-cv-1752-T-23TGW, 2016 WL 4702430, at *4 (M.D. Fla. Sept. 8, 2016) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001)).

Here, given the substantial AEDPA hurdles which Petitioner must clear to sustain his arguments, he cannot show that reasonable jurists would debate either the merits of the claims or any procedural issues. Thus, the Undersigned **recommends** that the District Court find that Petitioner is **not** entitled to a certificate of appealability.[13]

### IV.    Conclusion

---

[13]     As now provided by Rule 11(a), "[b]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, then that party may bring this argument to the attention of the District Court in the objections permitted to this Report and Recommendations.

For the reasons discussed above, the Undersigned **respectfully recommends** that the District Court **deny** Petitioner's habeas motion and not issue a certificate of appealability.

### V.      Objections

The parties will have 14 days from the date of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, at Miami, Florida, January 31, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola Jr.

All Counsel of Record